**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

ZIA-UR-RAHMAN, *et al.*,

      Petitioners,

      v.

ROBERT GATES, *et al.*,

      Respondents.

_____

Civil Action No. 10-CV-320 (EGS)

**RESPONDENTS' REPLY IN SUPPORT OF MOTION TO DISMISS
AND OPPOSITION TO PETITIONER'S MOTION FOR LEAVE
TO TAKE JURISDICTIONAL DISCOVERY**

Respondents respectfully submit this reply in support of their motion to dismiss the instant habeas petition (dkt. no. 15), which was filed on behalf of petitioner Zia-ur-Rahman ("Petitioner"), an Afghan citizen detained by the United States at the Detention Facility in Parwan at Bagram Airfield in the Islamic Republic of Afghanistan.  Respondents also oppose Petitioner's motion for leave to take jurisdictional discovery (dkt. no. 18).

In their opening brief, Respondents demonstrated that this Court has no subject matter jurisdiction to review Petitioner's habeas petition because the Court of Appeals has held that "the Suspension Clause does not extend to aliens held in Executive detention in the Bagram detention facility in the Afghan theater of war," *Maqaleh v. Gates*, 605 F.3d 84, 99 (D.C. Cir. 2010), and because the factual predicates to that holding have not materially changed to compel a different conclusion.  Petitioner argues in the opposition brief that the factual circumstances underlying *Maqaleh* have in fact changed to alter the constitutional balance because of new evidence regarding several of the factors articulated by the Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008):  (1) the administrative procedures for determining a detainee's

status, (2) the nature of the Bagram detention facility, and (3) the practical obstacles in extending

the writ to Bagram.  Petitioner, however, is wrong on each of these arguments.  Indeed, any

changes in the factual circumstances at Bagram actually further support the Court of Appeals'

conclusion that the writ of habeas corpus does not extend to Bagram, as demonstrated below.

## ARGUMENT

I.  **THE ADEQUACY OF PROCESS FACTOR HAS NOT CHANGED TO ALTER THE COURT OF APPEALS' CONCLUSION THAT THE SUSPENSION CLAUSE DOES NOT APPLY TO BAGRAM**

   A.  **Rather Than Undermining the Court of Appeals' Holding in *Maqaleh*, DoD's Implementation of More Robust Detainee Review Procedures at Bagram Actually Supports That Holding.**

In *Maqaleh*, the Court of Appeals found that the adequacy of process factor more

strongly favored the *Maqaleh* petitioners than the *Boumediene* petitioners because the

procedures at issue in *Maqaleh* at that time afforded the petitioners less protection than had been

afforded to the *Boumediene* petitioners, or to those in *Johnson v. Eisentrager*, 339 U.S. 763

(1950).  *See Maqaleh*, 605 F.3d at 96.  Despite that finding, the Court ultimately concluded that

the adequacy of process factor was insufficient to tip the constitutional balance to extend the writ

to Bagram.  At issue now is whether the adequacy of process factor has changed to alter that

constitutional calculus.  The answer is no.  As Respondents explained in their opening brief,

since *Maqaleh* was decided, the Department of Defense ("DoD") has put in place new

administrative procedures for determining detainee status, known as the Detainee Review Board

("DRB") procedures.  The DRB procedures not only improved DoD's ability to assess the

factual basis of each detainee's detention, the detainee's threat level, and his potential for

rehabilitation and reconciliation, but they also enhanced the detainee's ability to challenge his

detention.  *See* Resp. Opening Br. at 7, 12-14.  Indeed, since the implementation of the DRB

procedures, more than three hundred detainees have been released from Bagram, and hundreds

more were transferred to the Afghan government for prosecution or reconciliation, among other

dispositions.

Petitioner argues that the DRB procedures continue to be deficient and do not meet the

constitutional standards for "an adequate substitute for habeas," which, according to Petitioner,

requires a trial-like adversarial proceeding with rights to counsel, cross-examination, and judicial

review of the administrative determination.  *See* Petr's Opp'n Br. at 9, 13-14.  Specifically,

Petitioner compares the DRB procedures with the procedural protections received by the

*Eisentrager* petitioners as well as with the Combatant Status Review Tribunal ("CSRT")

procedures the Supreme Court examined in *Boumediene* in determining whether Guantanamo

detainees received an adequate substitute for habeas review.  *See* Petr's Opp'n Br. at 9-20.  For

example, Plaintiff complains that a personal representative—now provided under the DRB

procedures—is not an adequate substitute for counsel, and submits the declaration of a staff

member of a human rights organization, who opined that a lawyer would be better able to

advocate more effectively on behalf of detainees in the proceedings she observed.  *See* Petr's

Opp'n Br. at 7, 10-11; *id.* at 11 (citing Declaration of Daphne Eviatar, ¶ 10).[1]

Petitioner's arguments are misplaced.  Respondents have never taken the position, either

before the Court of Appeals regarding the procedures then at issue in *Maqaleh*, or in this Court

---

[1]   Respondents disagree with many of the assertions made in the Eviatar declaration, which is mostly based on the declarant's speculations and supposed interviews of unnamed U.S. officials and other unknown sources.  In any event, the assertions do not rebut Respondents' showing in this brief and the opening brief that this Court has no subject matter jurisdiction over this habeas petition.

regarding the DRB procedures, that the Bagram procedures constitute effective and adequate substitute for habeas corpus review within the mandate of the Suspension Clause.  Indeed, a requirement that status review procedures provide an effective and adequate substitute for habeas review presumes that the writ applies.  In *Boumediene*, the Supreme Court assessed whether the review process provided to Guantanamo detainees by Congress through the Detainee Treatment Act of 2005, 199 Stat. 2739, constituted an adequate and effective substitute for habeas review, *only after* holding that the Suspension Clause applies with full effect at Guantanamo Bay.  *See Boumediene*, 553 U.S. at 771-72 ("In light of this holding the question becomes whether the statute stripping jurisdiction to issue the writ avoids the Suspension Clause mandate because Congress has provided adequate substitute procedures for habeas corpus.").  Here, in contrast, the jurisdictional question before this Court is whether the writ of habeas corpus extends to Bagram in the first place.  The adequacy of process at Bagram is but one component of the *Boumediene* multi-factor test for making that determination.  In light of the fact that DoD has implemented more robust procedures for review of Bagram detainees' status than the procedures previously at issue in *Maqaleh*, the adequacy of process factor remains insufficient to upset the Court of Appeals' prior conclusion that the writ does not extend to Bagram.

> **B.   Petitioner's Challenges to the DRB Procedures Are, In Any Event, Without Merit.**

In his opposition brief, Petitioner devoted significant energy to challenge the adequacy of the DRB procedures.  As already demonstrated above, they are not directly relevant to the constitutional analysis before the Court.  Moreover, Petitioner's criticisms of the DRB procedures must be viewed in the context of the Supreme Court's admonition in *Boumediene* that, "[i]n considering both the procedural and substantive standards used to impose detention to

prevent acts of terrorism, proper deference must be accorded to the political branches."

*Boumediene*, 553 U.S. at 796-797 (citing *United States v. Curtiss-Wright Export Corp.,* 299 U.S.

304, 320 (1936)).  Within this context, Respondents will address a number of Petitioner's

arguments regarding the DRB procedures.

### 1.   The DRB Procedures Contain More Procedurals Safeguards than the Combatant Status Review Tribunals.

Petitioner argues that judicial review is even more necessary for Bagram detainees than

Guantanamo detainees because the DRB procedures have fewer safeguards than the CSRT

procedures previously available at Guantanamo.  *See* Petr's Opp'n Br. at 14.  But the DRB

procedures are in fact more robust than the CSRT procedures.  To take personal representatives

as an example—which were not provided under the procedures the Court of Appeals was

reviewing at the time of *Maqaleh*—the CSRT personal representative had no confidential

relationship[2] with the detainee and there was no requirement that he act and advocate for the

detainee.  The DRB personal representative, in contrast, is bound by a non-disclosure policy,

which prohibits him from disclosing information "detrimental to the detainee's case that was

obtained through communications with the detainee" as well as "adverse information discovered

by the personal representative's independent investigatory efforts."[3]  Harward Decl., Ex. C at 5.

---

[2] *See* Enclosure 3 to Combatant Status Review Tribunal Process, at 1, C.(1) ("Upon first contact with the detainee, the Personal Representative shall explain to the detainee that no confidential relationship exists or may be formed between the detainee and Personal Representative.").  The Combatant Status Review Tribunal procedures, including all enclosures, are available at http://www.defense.gov/news/Aug2006/d20060809CSRTProcedures.pdf.

[3] There are, of course, exceptions to the non-disclosure policy that are akin to the crime-fraud exception to the attorney-client privilege.  Thus, the personal representative needs to make disclosure necessary to prevent property damage and serious bodily harm or death.  He is also obligated to disclosure detainee conduct that is fraudulent and may refuse to offer evidence that he firmly believes is false, as long as such belief is grounded in an objectively reasonable

The DRB personal representative is also required to "act and advocate in the best interests of the detainee" by assisting the detainee in "gathering and presenting the information reasonably available in the light most favorable to the detainee."  *Id.* ¶ 9(e)(2); *see also* Harward Decl., Ex. B at 6.  Whereas the CSRT personal representative's role was primarily to assist the detainee in reviewing the relevant unclassified information, prepare and present information, question witnesses at the CSRT proceeding, and provide comments to aid the tribunal's deliberations, *see* Enclosure (3) to CSRT Procedures July 2007 at 1-2, the DRB personal representative conducts independent investigations and calls and interviews witnesses.  In fact, the DRB's personal representatives' task is made easier because, unlike in the CSRT process, the government's evidence presented at the DRB proceedings does not benefit from a presumption of validity.[4]

> **2.    The DRB Recorder, Although Often A Lawyer, Is A Neutral Party Required to Present all Evidence Relevant to Determining the Detainee's Status.**

Petitioner complains that the DRB personal representatives are not lawyers, whereas recorders, who are charged with the responsibility of presenting the government's evidence, are mostly Judge Advocate General ("JAG") lawyers.  *See* Petr's Opp'n Br. at 11 n.10.  Petitioner suggests that the DRB process is inherently unfair given this difference and the fact that personal representatives are part of the military chain of command.  But contrary to Petitioner's suggestion, a recorder does not function like a prosecutor.  Instead, a recorder "is neutral and does not represent or advocate on behalf of either the government or the detainees."  Harward

---

assessment of the facts.  *See* Harward Decl., Ex. C at 4-5.

[4]  *See* Section G(11) of the CSRT procedures ("Burden of Proof. * * * There is a rebuttable presumption that the Government Evidence, as defined in paragraph H (4) herein, submitted by the Recorder to support a determination that the detainee is an enemy combatant, is genuine and accurate.").

Decl., Ex. C at 4.  He "is obligated to present all relevant evidence to the Board that is reasonably available, including evidence tending to show that internment criteria are or *are not* met, *exculpatory evidence*, and evidence that bears on the detainee's potential for rehabilitation or reintegration."  *Id.* (emphasis added).

Moreover, to the extent Petitioner argues that the personal representative is biased because he is part of the military chain of command, the DRB procedures specifically provide that "[t]he personal representative's good faith efforts on behalf of the detainee shall not adversely affect his or her status as a military office (e.g., evaluation, promotion, future assignment)."  Harward Decl., Ex. B at 6.  Also, as noted above, all personal representatives are supervised by the Officer-in-Charge of the Detainee Assistance Center, who is a Judge Advocate, to ensure that they carry out their duty of advocating and acting in the best interests of the detainees.

### 3. The Non-disclosure of Classified Information to Either the Detainee or the Afghan Government Does Not Render the DRB Process Deficient.

Petitioner also complains that Bagram detainees are only provided with unclassified summaries of the allegations against them rather than "a bill of particular that contains detailed factual allegations," including classified information.  Petr's Opp'n Br. at 10, 12-13.  This argument has no merit because, even in the context of habeas review of war-time detention at Guantanamo, a habeas petitioner (as opposed to his attorney) is not entitled to classified information.  And, in domestic federal criminal prosecution, a defendant also does not have an automatic right to access the government's classified information.  *Cf.* Classified Information Procedures Act ("CIPA"), Pub. L. No. 96-456, 94 Stat. 2025, § 4 (governing the use of classified information in a federal criminal case).  Importantly, in the context of a DRB proceeding, a

detainee's personal representative, who would have the requisite security clearance, is entitled to review the government's classified information relevant to determining the detainee's status. *See* Harward Decl., Ex. C at 4.

Petitioner also speculates that the commander of detention operations may overturn a DRB recommendation to transfer a detainee to the Afghan government for prosecution "not because [continued detention] is necessary for any legitimate purpose, but because the United States refuses to provide classified intelligence to Afghan authorities in support of prosecution." Petr's Opp'n Br. at 15-16. Petitioner's argument is fundamentally flawed for two reasons. First, regarding the sharing of classified information, while DoD makes every effort to declassify information, including information related to the cases of detainees recommended for transfer to the Afghan government for prosecution, it has no authority to disclose classified information to Afghan prosecutors for use in court proceedings in Afghanistan. Rather, the handling of classified information is based on considerations of national security and is governed by Executive Order 12958, as amended by Executive Order 13292. *See* E.O. 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003).

Second, and more importantly, whether a detainee can appropriately be transferred to the Afghan government for prosecution is irrelevant to the threshold issue of whether the detainee meets the criteria for internment established pursuant to the Authorization for Use of Military Force ("AUMF"), as informed by the laws of war. Once a detainee is determined to be lawfully detained, then it is a matter of the Executive Branch's discretion whether to transfer the detainee to another country for prosecution, among other possible dispositions. Indeed, even if the Suspension Clause is found to apply to Bagram, the habeas court would only be concerned with determining whether the detainee is properly detained under the AUMF, as informed by the laws

of war, and would not be assessing whether the Executive Branch should nevertheless have

transferred the detainee to another country.

### 4.    Petitioner's Assertion That The Convening Authority Would Act Arbitrarily Is Speculative And Unfounded.

Petitioner also speculates that the commander, or more precisely the convening

authority,[5] may act arbitrarily to reverse the review board's recommendations.  Petitioner asserts

that in 15% of the DRB proceedings about which Petitioner's counsel was able to obtain the

records through the Freedom of Information Act, the convening authority rejected the review

board's recommendation.  Petitioner found the 15% rate of rejection disturbing because the

convening authority had not personally participated in the DRB proceedings and Petitioner's

counsel was unable to determine whether the convening authority actually reviewed the records

of those 15% of cases.  *See* Petr's Opp'n Br. at 15-16.

Petitioner's argument is wholly unfounded.  Even under domestic law, there is no due

process requirement that the final decision-maker in an administrative review process personally

participate in the proceedings in which factual presentations are made, much less that he or she

accept the legal recommendation of the fact-finder.  Moreover, it is important to note that it is

only when the Afghan detainee *meets* the detention criteria that the review board is required to

recommend an appropriate disposition to the convening authority, which may include continued

detention, transfer to the Afghan government for criminal prosecution or for participation in a

---

[5]  The Commander of Combined Joint Interagency Task Force ("CJATF") 435, which is responsible for operating the Detention Facility in Parwan, has designated the Deputy Commander of CJATF-435 to serve as the Convening Authority for detainee review boards. Harward Decl., Ex. C, ¶ 8.

reconciliation program, or release.[6]  Harward Decl., Ex. B at 4.  The record of such a proceeding is then forwarded to the Board Legal Advisor who is assigned to the Staff Judge Advocate for the convening authority for review of legal sufficiency.  *Id.* at 5.  There is no basis to suggest that the convening authority, when considering the DRB's recommendation after the legal sufficiency review, would simply ignore the record.

> ### 5.    International Standards Do Not Control Consideration of the Adequacy of Process Factor in Determining the Reach of the Suspension Clause.

Petitioner argues that the DRB procedures violate international law standards, including those of the Geneva Conventions.  Petr's Opp'n Br. at 18-20.  As Respondents have already explained in the opening brief, none of the international documents Petitioner cites confers separate jurisdiction on this Court to hear Petitioner's claims, and Section 5 of the Military Commissions Act explicitly prohibits individuals from invoking the Geneva Conventions as a private source of right.  *See* Resp. Opening Br. at 12 n.5.  And, if it were assumed that this Court had habeas jurisdiction over this petition, the particular treaty provisions Petitioner cites are either not self-executing or do not create rights that are directly judicially enforceable by individuals, let alone the particular rights he alleges here.  *Id.*

Petitioner maintains that the government has acknowledged that international law informs domestic law in this context, and therefore, the government is precluded from arguing that the Geneva Conventions or other sources of international law do not apply to interpret the Suspension Clause.  *See* Petr's Opp'n Br. at 17 n.14.  To be sure, the government has

---

[6]  In contrast, if the review board determines that an Afghan detainee does not meet the criteria for internment, "the detainee shall be released from DoD custody as soon as practicable, normally within 30 days of the board, without any further action necessary."  Harward Decl., Ex. C at 9; Ex. B at 4.

acknowledged, consistent with Supreme Court precedent, that its interpretation of its detention authority under the AUMF is to be informed by the laws of war, *see Al-Bihani v. Obama*, No. 09-5051, Govn't Br. at 6-7 (document: 1244617, filed May 13, 2010).  But this acknowledgment—which concerns only the scope of the Executive's detention authority—does not alter the Supreme Court's decision in *Boumediene* regarding how to weigh the various factors to determine the reach of the Suspension Clause, or the D.C. Circuit's decision in *Maqaleh* weighing those very factors to decide that the writ does not run to Bagram.[7]

In sum, the above discussion illustrates that the adequacy of process factor has not changed to compel the conclusion that the Suspension Clause applies to Bagram.  Rather, given the numerous additional procedural safeguards now afforded to Bagram detainees, there is no basis to upset the Court of Appeals' holding that habeas does not extend to Bagram.

## II.   THE SITE OF DETENTION FACTOR CONTINUES TO WEIGH STRONGLY IN FAVOR OF THE UNITED STATES

In *Maqaleh*, the Court of Appeals found that the site of detention prong of the *Boumediene* multi-factor test weighs heavily in favor of the United States because the degree of the United States' control over Bagram is unlike that over Guantanamo.  The Court observed that "whereas the United States has maintained total control of Guantanamo Bay for over a century,

---

[7]   In this regard, *Roper v. Simmons*, 551, 575-78 (2005), upon which Petitioner relies, is entirely inapposite.  In *Roper*, the Supreme Court referred to certain international instruments, as well as the practice of the States and foreign countries, to determine whether under current societal norms, the Eighth Amendment's prohibition against "cruel and unusual punishments" prohibits execution of individuals who were 17 years old at the time of the commission of crime. The Court did so because it has long held that, to determine which punishments are so disproportionate as to be cruel and unusual, the Court must necessarily refer to "the evolving standards of decency that mark the progress of a maturing society."  *Id.* at 543 U.S. at 560-561. There is, of course, no similar precedent of examining international instruments or practice in interpreting the Suspension Clause.

even in the face of a hostile government . . . there is no indication of any intent to occupy the [Bagram] base with permanence, nor is there hostility on the part of the 'host' country." *Maqaleh*, 605 F.3d at 97.  Thus, the Court concluded that "while it is certainly realistic to assert that the United States has *de facto* sovereignty over Guantanamo, the same simply is not true with respect to Bagram."  *Id.*

Petitioner claims that the nature of the United States' control over Bagram has changed.[8] According to Petitioner, this so because, despite the United States' stated goal of transferring all detention operations in Afghanistan to the Afghan government, (1) the targeted date for beginning the transition has been shifting and United States has avoided "putting a timeframe on the expected length of detention at Bagram"; (2) the United States has indicated that it will maintain control over a unit of the Bagram detention facility even after the rest of the facility is transferred to the Afghan government; and (3) Petitioner believes that some detainees may be held indefinitely.  *See* Petr's Opp'n Br. at 20-21, 21 n.17.

Even were these assertions accepted as true, none of them changes the nature of the United States' control over Bagram.  For purposes of the constitutional analysis regarding the United States' control over Bagram, the relevant inquiries here are whether the United States' continued presence at Bagram is necessitated by on-going war, and whether that presence is in the face of a hostile government.  As to the first question, the answer is clearly yes, as the United States' military operations in Afghanistan continue today.  It follows that the United States may

---

[8]  Comparing Bagram and Guantanamo Bay leases, Petitioner argues that "as a legal matter . . . Bagram stands in the same relationship to the United States as Guantanamo."  Petr's Opp'n Br. at 21.  The Court of Appeals has already rejected this precise argument, after considering the parties' extensive arguments on the nature of the Bagram release as compared to the Guantanamo release.  *See Maqaleh*, 605 F.3d at 87-88 (describing the Bagram lease).

maintain some detention operations at Bagram, because "the capture and detention of enemy

forces is by universal agreement and practice an important incident of war." *Hamdi v. Rumsfeld*,

542 U.S. 507, 518-19 (2004) (plurality opinion); *see also id.* at 521 ("[W]e understand Congress'

grant of authority for the use of 'necessary and appropriate force' to include the authority to

detain *for the duration of the relevant conflict*, and our understanding is based on longstanding

law-of-war principles.") (emphasis added).  Indeed, as in most wars, the operational demands of

the war are fluid.  Thus, Deputy Assistant Secretary of Defense Lietzau has explained that "U.S.

forces may need to maintain some detention capacity in Afghanistan, pursuant to the laws of

war, as long as military operations continue."  Lietzau Decl., ¶ 11.  However, as Deputy

Assistant Secretary of Defense Lietzau also explained, "[t]he United States does not intend to

continue to use the [Bagram detention facility] to detain any person pursuant to the

Authorization for the Use of Military Force, as informed by the laws of war, beyond the

cessation of hostilities with the Taliban, al-Qaeda and associated forces."  *Id.* ¶ 10.

    As to the second question, it is also beyond dispute that Afghanistan, on whose sovereign

territory Bagram Airfield is located, remains a friendly ally whose forces are conducting military

operations in concert with U.S. and coalition forces to defeat the Taliban, al Qaeda and

associated forces.  In other words, Plaintiff's complaint about the speed of transition of detention

operations at Bagram is misplaced because it says nothing about the nature of the United States'

presence at Bagram.  It is enough that United States fully respects Afghan sovereignty and

remains committed to the transition of detention operations to Afghanistan.  On those issues, the

United States' intention cannot be more clear.  Just last year, the President specifically

"reaffirmed [the United States'] commitment to transitioning responsibility for detention

facilities to the Afghan Government." *Joint Statement from the President and President Karzai of Afghanistan* (dated May 12, 2010) (*available at* http://www.whitehouse.gov/the-press-office/joint-statement-president-and-president-karzai-afghanistan).  The President agreed with President Karzai of Afghanistan that "[t]his process [would] begin at the Parwan detention facility in January 2011."  *Id.*  Moreover, in their joint statement, "[b]oth Presidents recognized that a successful transition will be an important milestone toward achieving President Karzai's inaugural pledge of having the Afghan Government assume full responsibility over detention operations."  *Id.*  The joint statement further provided:

> As part of this transition process, President Karzai welcomed continued U.S. assistance to build a safe, secure, and humane corrections system.  Underscoring the United States' respect for Afghanistan's sovereignty, President Obama also emphasized his strong desire to see all search, arrest, and detention operations be carried out by the Afghan National Security Forces.  He and President Karzai directed their senior defense advisors to accelerate and further clarify the timeline for the transition process, and also to consider additional steps to address this Afghan Government priority.

*Id.*  As Deputy Assistant Secretary of Defense Lietzau explained in his declaration, the speed of the transition necessarily depends on, among other things, the Afghan capacity to prosecute individuals under Afghan law, and whether the Afghan government is fully equipped and able to perform its detention, prosecution, and incarceration responsibilities in accordance with its international obligations and Afghan law.[9]  Lietzau Decl. ¶ 3.

    In sum, there is no change to the United States' commitment and intention regarding Bagram that would affect the constitutional calculus reached by the Court of Appeals in

_____

[9]  The transition has already begun.  One housing unit was turned over to the Afghan government in January 2011, and a couple hundred Afghan detainees were also transferred for prosecution.  Additional housing units will be transitioned to Afghan control when Afghan security forces are fully trained and equipped to operate them and the detainee population in the first transferred housing unit reaches capacity.

*Maqaleh.*

## III.   THE PRACTICAL OBSTACLES OF EXTENDING THE WRIT TO BAGRAM REMAIN UNCHANGED

Plaintiff argues that the practical obstacles factor of the *Boumediene* test has changed "in light of new evidence" that has become available since *Maqaleh* was decided. *See* Petr's Opp'n Br. at 24.  In *Maqaleh*, the Court of Appeals found that the practical obstacles factor "weighs overwhelmingly in favor of the position of the United States" because "[i]t is undisputed that Bagram, indeed the entire nation of Afghanistan, remains a theater of war." *Maqaleh*, 605 F.3d at 97.  The Court cited the fact that Bagram "has been subjected to repeated attacks from the Taliban and al Qaeda," resulting in death and injury of United States service members and other personnel. *Id.*   The Court also found the fact that "the detention at Bagram is within the sovereign territory of another nation (where the United States does not enjoy *de facto* sovereignty) by itself creates practical difficulties." *Id.* at 99.

The new evidence Petitioner cites is the fact that Afghan criminal trials by the Afghan government are now being conducted at Bagram.  To be sure, Afghan criminal trials (initially conducted at the DFIP) are taking place at the Afghan Justice Center in Parwan, which is located adjacent to the Detention Facility in Parwan ("DFIP").  The DFIP, in turn, is a newly constructed detention facility located on the outer perimeter of Bagram Airfield.[10]  *See* Harward Decl., ¶ 1; Lietzau Decl., ¶ 2.  According to Petitioner, given that the military now voluntarily allows Afghan criminal trials at Bagram, the United States cannot argue that habeas proceedings for Bagram detainees would compromise the military's mission or pose anything other than

---

[10]  The DFIP's location is intended to facilitate its eventual transfer to the Afghan government.  *See* Lietzau Decl., ¶ 2.  In late 2009, the United States transferred all of the detainees at the Bagram Theater Internment Facility to the DFIP.  *Id.*

"administrative inconvenience."  *See* Petr's Opp'n Br. at 24-25.

This "new evidence" does not undermine the Court of Appeals' prior conclusion that practical obstacles of extending the writ to Bagram strongly counsel against the extension.  Part of the United States' overall effort to transition detention operations to the Afghan government is to assist in improving the Afghan legal process, as the transition is conditioned upon, among other things, Afghan judicial capacity to criminally prosecute under Afghan law detainees held at Bagram.  *See* Lietzau Decl. ¶ 6.  Indeed, consistent with a memorandum of understanding signed by the pertinent Afghan ministries, it is expected that once the DFIP is transferred to the Afghan government, it will become part of the Afghan Justice Center in Parwan, which in turn will be the central location for Afghanistan's pre-trial detention, prosecution, and post trial incarceration of individuals who commit crimes against Afghan security.  *Id.* ¶ 7.  The fact that the Afghan government has now begun conducting criminal trials at Bagram in the Afghan Justice Center in Parwan merely demonstrates that the host government is performing quintessentially sovereign acts at Bagram, making it even more clear why Bagram is readily distinguishable from Guantanamo and bolstering the Court of Appeals' conclusion that extending habeas to Bagram could complicate U.S.-Afghan relations.  *See Maqaleh*, 605 F.3d at 99.

The practical obstacles associated with conducting habeas litigation in a theater of war by a U.S. court, on the other hand, remain the same, as is the Court of Appeal's prior observations that "Bagram, indeed the entire nation of Afghanistan, remains a theater of war," and that "petitioners cannot credibly dispute[] that all of the attributes of a facility exposed to the vagaries of war are present in Bagram."  *Maqaleh*, 605 F.3d at 97.  The Afghan government's conduct of criminal trials at Bagram, where the accused are housed, by no means suggests that the vagaries

of war no longer exist.  Indeed, in 2010, Bagram Airfield was attacked 29 times, the last one

being on December 30, 2010, with insurgents firing two rockets into Bagram Airfield.[11]  Bagram

remains an active war zone, a factor that the Court of Appeals held weighs more heavily in favor

of Respondents than even the post-WWII situation in *Eisentrager*, 339 U.S. at 763.  *See*

*Maqaleh*, 605 F.3d at 97.

Moreover, although Petitioner dismisses the burden of habeas trials for Bagram detainees

as mere administrative inconvenience, the experience of the Guantanamo habeas litigation

demonstrates that the burden of litigating even a few cases is substantial, given the evidentiary

and discovery requirements that will be imposed on the military's intelligence, detention, and

war-fighting apparatus.  This is particularly the case if taking into account the logistical and

operational difficulties of permitting counsel access either in person or by other means in a

theater of war.

In sum, none of the factual circumstances underlying the Court of Appeals' holding in

*Maqaleh* has changed to compel this Court to reach a different conclusion.  Accordingly, this

Court should dismiss the Amended Petition for Writ of Habeas Corpus.

## IV.    PETITIONER IS NOT ENTITLED TO JURISDICTIONAL DISCOVERY

Relying on the standard governing Fed. R. Civ. P. 12(b)(1) motions in civil litigation,

Petitioner has separately moved for an order granting them leave to take jurisdictional discovery.

(Dkt. no. 18).   Jurisdictional discovery, however, is unwarranted in this case.  Even in a habeas

case not involving wartime-detention in a theater of war, the Supreme Court has held that "'[a]

---

[11]  *See Taliban Fires Rockets Into Main US Base Near Kabul* (*available at*
http://www.aaj.tv/2010/12/taliban-fires-rockets-into-main-us-base-near-kabul) (last accessed
Feb. 14, 2011).

habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course.'" *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 295 (1969)).

Moreover, in this case, Petitioner has no basis to dispute Respondents' jurisdictional showing, and even if Petitioner's factual assertions were true, they do not change the constitutional analysis. *Cf. Coalition for Underground Expansion v. Mineta*, 333 F.3d 193 (D.C. Cir. 2003) (rejecting plaintiffs' argument that the district court erred in considering a declaration submitted by defendant on a Rule 12(b)(1) motion without affording plaintiff an opportunity for discovery, where plaintiff has made no factual allegations which, if substantiated, would establish jurisdiction); Rule 6(a) of the Rules Governing Section 2254 Cases[12] (requiring leave of court for good cause shown before discovery may be conducted in habeas case by state prisoners).

Petitioner claims that he is entitled to discovery regarding "the adequacy of the DRB process at Bagram as a substitute for habeas review." Petr's Motion for Leave to Take Jurisdictional Discovery [Petr's Mot.] at 3. However, as already discussed above, Respondents do not contend that the DRB process constitutes an adequate habeas substitute under the mandate of the Suspension Clause. And, under the *Boumediene* multi-factor analysis, the Court of Appeals has already determined that the adequacy of process considerations – based on prior procedures that offered fewer procedural safeguards than the DRB procedures – were insufficient to require the extension of the writ to Bagram.

Petitioner also argues that discovery is necessary to determine "the government's plans to

---

[12]   Whether or not the Rules Governing Section 2254 Cases actually apply here, the limitation of discovery in such cases is instructive at least by analogy.

hold [detainees] at Bagram indefinitely" and "the categories of detainees who may be held indefinitely." Petr's Mot. at 3. Again, Petitioner's discovery requests have no relevance to the constitutional question of whether the United States exercises *de facto* sovereignty over Bagram. It is true that it is currently unknown when hostilities will cease. However, granting Petitioner's discovery requests will not lead to information that will rebut Respondents' showing that the United States' presence at Bagram is necessitated by ongoing military operations there. Nor can Petitioner rebut the Executive's express intention not to occupy Bagram with any permanence. As demonstrated by the joint statement of the President and President Karzai of Afghanistan, as well as by the declaration of Deputy Assistant Secretary of Defense Lietzau, the United States fully respects Afghan sovereignty and is firmly committed to transition detention operations at Bagram to the Afghan government.

Finally, Petitioner argues that he is entitled to discovery "about the existence of practical obstacles standing in the way of habeas jurisdiction." Petr's Mot. at 3. The Court of Appeals did not find it necessary to have additional factual development on this point when holding that the practical obstacles of extending the writ to Bagram strongly weighs in favor of the United States. This is so because Bagram is in an active theater of war and "petitioners cannot credibly dispute[] that all of the attributes of a facility exposed to the vagaries of war are present in Bagram." *Maqaleh*, 605 F.3d at 97. Presumably Petitioner would seek discovery on, among other things, the logistical and operational obstacles for allowing counsel access to the detainees at Bagram either in person or through some other means, for gathering evidence, and for presenting classified information and other evidence to this Court. This type of discovery, however, would intrude on military operations and the limited resources in Afghanistan and

entail the very type of litigation found inappropriate by the Supreme Court in *Eisentrager*, 339

U.S. at 779, and by the Court of Appeals in *Maqaleh*.  *Cf. In re Iraq and Afghanistan Detainees*

*Litigation*, No. 06-0145, 497 F. Supp. 2d 85, 105 (D.D.C. 2007) (in dismissing a suit by former

detainees in Afghanistan and Iraq against U.S. government officials, holding that  "[t]he

discovery process alone risks aiding our enemies by affording them a mechanism to obtain what

information they could about military affairs and disrupt command missions by wresting

officials from the battlefield to answer compelled deposition and other discovery inquiries").

In light of Petitioner's reliance on the United States' agreement with the Afghan

government for the conduct of Afghan trials at Bagram, the discovery he requests would also

intrude into matters of foreign relations, which have been constitutionally vested in the

Executive and "are so exclusively entrusted to the political branches of government as to be

largely immune from judicial inquiry or interference."  *Matthews*, 426 U.S. at 81 n.17.  The

intrusion likely would compromise the Executive Branch's ability to interact effectively with

Afghanistan and undermine the President's constitutional authority as Commander-in-Chief.  *See*

*People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) ("[I]t is beyond the

judicial function for a court to review foreign policy decisions of the Executive Branch.") (citing

*Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103 (1948)); *Schneider v.*

*Kissinger*, 412 F.3d 190, 197 (D.C. Cir. 2005) ("pass[ing] judgment on the policy-based decision

of the executive" in foreign policy "is not the stuff of adjudication"); *Holmes v. Laird*, 459 F.2d

1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the

interacting interests of the United States and of foreign countries, and in assessing them [the

courts] must move with the circumspection appropriate when [a court] is adjudicating issues

inevitably entangled in the conduct of our international relations.'") (quoting *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 383 (1959)).

In sum, Petitioner has failed to establish good cause for jurisdictional discovery.

## CONCLUSION

For the foregoing reasons, Respondents respectfully request that this Court deny Petitioner's motion for leave to take jurisdictional discovery and grant Respondents' motion to dismiss the Amended Petition for Writ of Habeas Corpus.

Dated:   March 31, 2010

Respectfully submitted,

TONY WEST
Assistant Attorney General

JOHN R. TYLER
Assistant Branch Director

    /s/   *Jean Lin*
JEAN LIN
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-3716
Attorneys for Respondents