**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ZIA-UR-RAHMAN, *et al.*,

          Petitioners,

v.

ROBERT GATES*, et al.*,

          Repondents.

No. 10-cv-320-EGS

---

**PETITIONERS' REPLY IN SUPPORT OF MOTION**
**FOR LEAVE TO TAKE JURISDICTIONAL DISCOVERY**

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel: 202-457-0800; Fax: 202-452.1868
art@aclu-nca.org

Hina Shamsi
Jonathan Manes
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
Tel: (212) 284-7321; Fax: (212) 549-2654
hshamsi@aclu.org

Jonathan Hafetz
169 Hicks Street
Brooklyn, NY 11201
Tel: (917) 355-6996
hafetzj@yahoo.com

Tina M. Foster
International Justice Network
PO Box 610119
New York, NY 11361-0119
Tel: (917) 442-9580
tina.foster@ijnetwork.org

Dated: April 13, 2011

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     MR. RAHMAN IS ENTITLED TO JURISDICTIONAL DISCOVERY ...................... 2

II.    DISCOVERY IS REQUIRED TO RESOLVE FACTUAL DISPUTES UPON
       WHICH THE COURT'S JURISDICTION TURNS ...................................................... 4

   A.   Mr. Rahman is entitled to jurisdictional discovery on whether the Detainee
        Review Board process falls below the standards articulated in *Boumediene* ................. 5

      (i)     Mr. Rahman is entitled to jurisdictional discovery on whether DRB
              procedures provide effective notice of allegations and a meaningful
              opportunity for detainees to rebut the evidence against them ................................. 7

      (ii)    Mr. Rahman is entitled to jurisdictional discovery on the functioning of
              Personal Representatives as substitute for counsel ................................................ 8

      (iii)   Mr. Rahman is entitled to jurisdictional discovery on whether the DRB
              review process is arbitrary and subject to standardless and unilateral
              military discretion ............................................................................................. 10

   B.   Mr. Rahman is entitled to jurisdictional discovery on the nature of the United
        States' presence at Bagram, its plans to hold certain categories of prisoners
        indefinitely, and its determinations with respect to Mr. Rahman in particular ........... 12

   C.   Mr. Rahman is entitled to jurisdictional discovery on the existence of "practical
        obstacles" ................................................................................................................ 14

CONCLUSION ................................................................................................................. 16

**INTRODUCTION**

In order to determine whether it has jurisdiction to hear Petitioner Zia-ur-Rahman's habeas petition, this Court must weigh the facts necessary to apply the three-factor test set out in *Boumediene v. Bush*, 553 U.S. 723 (2008), and reiterated in *Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010): the adequacy of the U.S. military's process for determining detainees' status, the extent of U.S. unilateral jurisdiction and control over the detention, and the practical obstacles to habeas review.

Mr. Rahman has alleged—and has presented substantial evidence in support of his allegations—that the factual circumstances of his case differ from those before the Court of Appeals in *Al Maqaleh*.  Respondents do not contest that the factual circumstances underpinning the D.C. Circuit's decision in *Al Maqaleh* have changed.  They only disagree whether the changes Mr. Rahman identifies alter the outcome of the jurisdictional balancing test this Court must undertake to determine whether the Suspension Clause reaches Mr. Rahman.  For the Court to make this determination, it must ensure that it has an adequate record on which to base its findings, and on which to resolve the factual disputes between the parties.  Petitioners believe that the record now before the Court conclusively establishes that the Suspension Clause reaches Mr. Rahman, and that this Court should hear his habeas petition.  If the Court determines, however, that the evidence is not sufficient to establish jurisdiction, Mr. Rahman is entitled to discovery and a hearing on the jurisdictional facts that Respondents challenge.  It is precisely in circumstances like this—where liberty, one of the most fundamental of interests, is at stake—that jurisdictional discovery is both necessary and required.

**ARGUMENT**

**I.   MR. RAHMAN IS ENTITLED TO JURISDICTIONAL DISCOVERY**

The D.C. Circuit instructs that district courts "must give the plaintiff ample opportunity

to secure and present evidence relevant to the existence of jurisdiction." *Phoenix Consulting,*

*Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (quoting *Prakash v. Am. Univ.*, 727

F.2d 1174, 1179-80 (D.C. Cir. 1984)) (internal quotation marks omitted).  Discovery is

especially important where, as here, the separation of powers "design [that] serves not only to

make Government accountable but also to secure individual liberty" is at stake.  *Boumediene*,

553 U.S. at 742.  Indeed, when the government introduces factual material beyond the pleadings

to contest jurisdiction, as Respondents have done, this Court must consider "what procedural

protections could be required to assure that a full airing of the facts pertinent to a decision on the

jurisdictional question may be given to all parties." *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d

192, 198 (D.C. Cir. 1992).

Applying these principles in habeas cases such as this one, this Court has granted

petitioners discovery on factual allegations that, if substantiated, would support the existence of

jurisdiction.  *See Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 67-69 (D.D.C. 2004); *cf. Idema v.*

*Rice*, 478 F. Supp. 2d 47, 53 (D.D.C. 2007) (Sullivan, J.) (ordering government to respond to

petitioner's factual allegations because the Court "[could not] simply ignore petitioners' alleged

facts and find that it lacks jurisdiction without any response to these troubling facts by

respondents.").  In *Abu Ali*, as in Mr. Rahman's case, the jurisdictional "inquiry . . . entail[s] a

consideration of several factors" that must be considered in determining whether habeas

jurisdiction exists.  350 F. Supp. 2d at 68; Pet'rs' Mot. for Leave to Take Jurisdictional Disc. 2,

ECF No. 18 ("Pet'rs' Disc. Mot.") (discussing multi-factor jurisdictional test mandated by

*Boumediene* and *Al Maqaleh*); Pet'rs' Opp'n to Resp'ts' Mot. to Dismiss 27-28, ECF No. 19

("Pet'rs' Opp'n") (same).   In that case, as in this one, the "petitioners have supplied [evidence

that] is considerable in the absence of discovery, and speaks to each of these [factors]."  350 F.

Supp. at 68; Pet'rs' Disc. Mot. 2 (describing new evidence relevant to jurisdictional analysis);

Pet'rs' Opp'n 28 (same).  Following *Abu Ali*, therefore, if this Court finds the evidence in the

record before it is insufficient to settle jurisdictional facts, it should order "expeditious but

cautious" discovery in order to give the "petitioners . . . an opportunity to establish the

jurisdiction of this Court over their habeas petition."  350 F. Supp. at 69.

Ignoring precedent that recognizes the importance of discovery—and grants it—when the

courts' jurisdiction is at issue, Respondents rely on inapposite cases, in which jurisdiction is not

in dispute, to argue that Mr. Rahman is not entitled to discovery.  Resp'ts' Reply in Supp. of

Mot. to Dismiss and Opp'n to Pet'rs' Mot. for Leave to Take Jurisdictional Disc. 17-18, ECF

No. 24 ("Resp'ts' Opp'n") (citing *Bracy v. Gramley*, 520 U.S. 899, 904 (1997), concerning

discovery on the merits of a post-conviction habeas petition, and *Coalition. for Underground

Expansion v. Mineta*, 333 F.3d 193 (D.C. Cir. 2003), concerning standing to raise claims under

federal environmental laws).[1]   Indeed, the courts' reasoning in these cases actually supports Mr.

Rahman's request for discovery.  In *Bracy*, the Supreme Court overruled the Seventh Circuit and

held that the petitioner was entitled to take discovery in order "to dispose of habeas petitions as

law and justice require," just as they require in Mr. Rahman's case.  *Bracy*, 520 U.S. at 904

(quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)) (internal quotation marks omitted).  In

---

[1] Respondents' citation to limitations on discovery in the Rules Governing Section 2254 Cases is not, as they argue, "instructive at least by analogy," Resp'ts' Opp'n 18 n.12, because the analogy does not work.  Federal courts' jurisdiction to adjudicate state prisoners' habeas petitions is not at issue in Section 2254 cases, as it is here.

*Mineta*, the Court of Appeals upheld the district court's denial of discovery only because it found that discovery could not change the court's conclusion that plaintiffs did not have standing, as a matter of law, to raise federal claims. *Mineta*, 333 F.3d at 198 ("[T]he [plaintiff] has made no allegation which, if substantiated, would establish standing to sue under the APA"). Unlike in *Mineta*, factual discovery in Mr. Rahman's case will determine the threshold question whether this Court has jurisdiction to adjudicate his habeas petition. Respondents' arguments that Mr. Rahman is not entitled to jurisdictional discovery fail.

## II. DISCOVERY IS REQUIRED TO RESOLVE FACTUAL DISPUTES UPON WHICH THE COURT'S JURISDICTION TURNS

Mr. Rahman has offered evidence to dispute the government's factual assertions about each of the three jurisdictional factors identified in *Boumediene* and analyzed in *Al Maqaleh*: (1) the adequacy of the Detainee Review Board ("DRB") process the U.S. military uses to determine Mr. Rahman's status; (2) the nature of U.S. control over Bagram prison and its plans to hold detainees—including, potentially, Mr. Rahman—indefinitely there; and (3) whether practical obstacles stand in the way of Mr. Rahman's entitlement to the Writ. *See* Pet'rs' Disc. Mot. 1-3 (summarizing the material factual disputes between the parties); Pet'rs' Opp'n 28-29 (same). As discussed below, if these factual disputes are resolved in Mr. Rahman's favor, the Suspension Clause applies, and this Court has jurisdiction, under *Boumediene* and *Al Maqaleh*, to adjudicate his case. In order to determine its jurisdiction, therefore, this Court must decide the factual disputes between the parties. Petitioners believe that the evidence in the record conclusively establishes that the Suspension Clause reaches Mr. Rahman's habeas petition. But if this Court determines that the evidence is not sufficient to establish its jurisdiction, it would be premature for the Court to dismiss Mr. Rahman's case without discovery. Instead, Mr. Rahman should be granted the limited discovery he seeks so that this Court can properly assess his right to the Writ.

4

**A. Mr. Rahman is entitled to jurisdictional discovery on whether the Detainee Review Board process falls below the standards articulated in *Boumediene*.**

Mr. Rahman has introduced substantial evidence that the DRB process is inadequate, meeting the first factor in the *Boumediene* jurisdictional analysis. *See* Pet'rs' Opp'n 9-20; Pet'rs' Disc. Mot. 2. Specifically, he has shown that: DRBs do not provide effective notice of allegations; they fail to provide access to counsel; they do not provide detainees an adequate opportunity to rebut evidence; the ultimate detention determinations are not in the DRB's hands but may be overturned by the unilateral, standardless discretion of the Bagram Commander;[2] and DRB decisions are not subject to review by a court or an independent or impartial tribunal. *See* Pet'rs' Opp'n 9-20 (citing declarations and exhibits).

In their Reply, Respondents agree with Mr. Rahman that this Court must assess the adequacy of the DRB process to determine whether the Suspension Clause applies, but argue at the same time that the adequacy of the process as a habeas substitute is a determination that should only be made at the merits stage. Resp'ts' Opp'n 3-4, 18. Respondents also assert that DRBs compare favorably to the CSRTs at issue in *Boumediene.* Resp'ts' Opp'n 5-6. As discussed below, Respondents' first argument makes a distinction without a difference, and the

---

[2] Respondents assert that it is the Convening Authority, not the Commander, who reviews DRB determinations and makes the final determination on the disposition of Bagram detainees. Resp'ts' Opp'n 9 n.5. But records of DRB proceedings provided to the American Civil Liberties Union ("ACLU") through FOIA in a separate litigation show otherwise. The ACLU has received hundreds of final DRB decision memoranda that either affirm or overrule the DRB's recommendations. *See, e.g.,* Decl. of Hina Shamsi, Ex. R-T, ECF No. 19-1 ("Shamsi Decl."). Many of these memoranda are signed not by the Convening Authority, but by the Commander himself. Shamsi Decl., Ex. R-S (copies of final decision memos signed by the then-commander "Curtis M. Scaparotti, Major General, USA, Commanding"). That the government's own records contradict Respondents' factual assertions further supports the need for discovery on the DRB process.

second serves only to underscore that discovery is necessary to resolve factual disputes between the parties.

As the Supreme Court made clear in *Boumediene*, the adequacy of the U.S. military's detention status determination process is one of three jurisdictional factors this Court must apply in assessing whether the Suspension Clause applies.  *Boumediene*, 553 U.S. at 766 ("[W]e conclude that at least three factors are relevant in determining the reach of the Suspension Clause: (1) . . . the adequacy of the process through which that status determination was made"). The Supreme Court then engaged in a detailed analysis of "the procedural protections afforded to the detainees in the [Guantánamo] CSRT hearings," and found they "fall well short" of the "procedures and adversarial mechanisms that would eliminate the need for habeas corpus review" and that were afforded to the plaintiffs in *Johnson v. Eisentrager*, 339 U.S. 763 (1950).[3] *Boumediene*, 553 U.S. at 766-67.  Any doubt that this Court should assess the adequacy of DRBs at the initial, jurisdictional stage is eliminated by the D.C. Circuit's similarly detailed examination of DRBs "'in determining the reach of the Suspension Clause.'"  *Al Maqaleh*, 605 F.3d at 93-94, 96 (quoting *Boumediene*, 553 U.S. at 766).  Each of the deficiencies with the DRB process that Mr. Rahman details was a deficiency examined at the jurisdictional stage by the Supreme Court in *Boumediene* and the D.C. Circuit in *Al Maqaleh*.

Mr. Rahman has introduced substantial evidence that the DRBs fall short of the adequacy-of-process yardsticks established in *Boumediene* and *Al Maqaleh*, *see* Pet'rs' Opp'n 9-

---

[3] The Supreme Court also, of course, examined whether the CSRTs were an "adequate substitute for habeas corpus" on the merits of the Suspension Clause claim, after jurisdiction had been established.  *Boumediene*, 553 U.S. at 771-93.

20,[4] while Respondents argue that the procedures are adequate.  If the Court finds Mr. Rahman's

evidence insufficient to establish the reach of the Suspension Clause, this Court should grant

limited discovery.

     **(i)**     **Mr. Rahman is entitled to jurisdictional discovery on whether DRB procedures provide effective notice of allegations and a meaningful opportunity for detainees to rebut the evidence against them.**

Both *Boumediene* and *Al Maqaleh* establish that the kind of notice courts find "effective"

is akin to "a bill of particulars that [makes] detailed factual allegations."  *Boumediene*, 553 U.S.

at 767; *Al Maqaleh*, 605 F.3d at 96.  Mr. Rahman has shown that the notice Bagram detainees

receive is far from a "bill of particulars" because evidence underlying the charges is classified,

and the military makes little or no effort to provide unclassified summaries or other substitutes

for such evidence.  Pet'rs' Opp'n 12-13.  He has also introduced evidence that detainees cannot

meaningfully respond to the charges against them because DRB hearings rely entirely, or almost

entirely, on classified evidence and detainees' access to evidence is limited to what the military,

in its sole discretion, determines is "reasonably available."  *Id.*

Respondents wrongly contend, in response, that Mr. Rahman's showings have no merit

because Guantánamo military detainees—or even defendants in domestic criminal cases—are

---

[4] These fundamental indicia of adequate process are also required by international law. *See* Pet'rs' Opp'n 17-20.  Respondents contend that international legal standards are irrelevant to determining the reach of the Suspension Clause.  Resp'ts' Opp'n 10-11.  Petitioners disagree; international law illuminates the issues before the court.  *See* Pet'rs' Opp'n 17 n.5; *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 520-21 (plurality op.) (referring to international law in deciding the closely related question of whether Due Process permitted a citizen captured on the battlefield in Afghanistan to be detained without judicial process); *id.* at 549-50 (Souter, J., concurring in the judgment) (same); *Paquete Habana*, 175 U.S. 677, 700 (1900) ("International law is our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination.").  *See generally* Sarah H. Cleveland, *Embedded International Law and the Constitution Abroad*, 111 Colum. L. Rev. 225 (2010) (demonstrating that *Boumediene*'s jurisdictional holding is consistent with international law approaches to jurisdiction).

*never* provided with classified information, and that Mr. Rahman is asking for "trial-like" procedures at Bagram.  Resp'ts' Opp'n 3, 7-8.  This response both overstates Mr. Rahman's argument and misses the point.  Mr. Rahman does not contend that detainees must be shown properly classified evidence.  Rather, he argues that because DRBs rarely or never provide an unclassified summary, or any other substitute for the classified evidence against a detainee— which Guantánamo detainees and defendants in domestic criminal cases *do* receive—the DRBs fail to provide meaningful notice or a meaningful opportunity to rebut charges.  To resolve any factual disputes about the adequacy of notice, Mr. Rahman is entitled to discovery.

   **(ii)      Mr. Rahman is entitled to jurisdictional discovery on the functioning of
             Personal Representatives as substitute for counsel.**

   In *Boumediene*, the Supreme Court found that the absence of legal counsel is a factor that favors habeas jurisdiction, and further found that the "personal representative" assigned to detainees in the Guantánamo CSRTs was "not the detainee's lawyer or even his 'advocate,'" and therefore not an adequate substitute for counsel.  553 U.S. at 767; *see also Al Maqaleh*, 605 F.3d at 96.  Respondents do not—and cannot—dispute that Bagram Personal Representatives ("PRs") are not attorneys, and that the rules governing DRBs prohibit Bagram detainees from access to counsel.  Decl. of Robert S. Harward, Ex. C. ¶ 9(e)(3), ECF No. 15-2 ("Harward Decl.").[5]

---

   [5] In this respect, as in others, detainees at Bagram are worse off than those at Guantanamo.  *Cf.* Resp'ts' Opp'n 5 (claiming that DRB procedures are better than CSRTs). Although lawyers for Guantánamo detainees were not permitted to appear at their clients' CSRTs or the subsequent annual Administrative Review Boards, starting in 2005, they at least had the possibility of advising their clients with respect to the hearings.  *See* Shamsi Decl., Ex. I (lawyers began meeting Guantanamo detainees in March 2005); Dep't of Defense, Combatant Status Review Tribunal Summary (Feb. 10, 2009), *available at* http://www.defense.gov/news/csrtsummary.pdf (49 CSRTs were held in 2005 or later); Press Release, Dep't of Defense, Guantánamo Bay Detainee Administrative Review Board Decisions Completed (Feb. 9, 2006), *available at* http://www.defense.gov/releases/release.aspx?releaseid=9302 (the first round of ARBs were

Instead, Respondents argue that PRs are subject to a "non-disclosure policy;" have a mandate to "gather[] and present[] evidence" on the detainees' behalf; and are therefore better than the CSRT personal representatives the Supreme Court in *Boumediene* found inadequate.  Resp'ts' Opp'n 5-6.  As both *Al Maqaleh* and *Boumediene* make clear, however, the relevant inquiry is how a PR compares with an attorney.  *Al Maqaleh*, 605 F.3d at 96; *Boumediene*, 553 U.S. at 767.  Mr. Rahman has introduced evidence that the PR non-disclosure policy is in no way a substitute for the ethical duties of an attorney.  Pet'rs' Opp'n 11-12.  He has also introduced evidence that PRs are unable to effectively gather evidence on a detainee's behalf, and that they do not have the skills or training necessary to be effective advocates.  *Id.*  Detainees like Mr. Rahman are also at a disadvantage because, unlike the non-lawyer PRs assigned to them, the Recorder—the official charged with presenting the government's evidence—is almost always a trained lawyer from the Judge Advocate General Corps.  *Id.* at 7 n.4.  Respondents seek to mitigate this disparity by arguing that, in presenting the government's evidence to the DRB, the Recorder must disclose both inculpatory and exculpatory evidence.  Resp'ts' Opp'n 6-7.  But the fact remains that a military lawyer presents the government's case against a detainee while the only

---

completed in December 2005 and continued annually).  In contrast, counsel for Bagram detainees are prohibited from contact with their clients.

The draconian nature of the U.S. military's restrictions is manifestly clear from one recent and extraordinary example, in what appears to be the first direct interaction between a Bagram detainee and his U.S. lawyer.  Detainee Amin al-Bakri "met" his lawyer for the first time when the lawyer was asked by a PR to testify by phone as a witness on Mr. al-Bakri's behalf at his DRB.  *See* Decl. of Ramzi Kassem, *Al-Bakri v. Gates*, No. 08-cv-1307-JDB (D.D.C. April 4, 2011), ECF No. 58-1.  Apart from the testimony, the DRB prohibited Mr. al-Bakri's lawyer from having any contact with Mr. al-Bakri before or after the hearing, including to prepare for the lawyer's intervention as a witness.  Questions Mr. al-Bakri had for his lawyer could only be answered by the lawyer in the form of testimony before the DRB.  The DRB thus prevented any possibility that Mr. al-Bakri might receive legal advice from his own lawyer.  *Id.* ¶¶ 6-15.

person tasked with assisting in the detainee's defense is expressly forbidden, under Respondents' rules, from being a lawyer.

Mr. Rahman has introduced compelling evidence that PRs come far short of being adequate substitutes for counsel, and he is entitled to discovery to settle any factual disputes with Respondents.

> **(iii)    Mr. Rahman is entitled to jurisdictional discovery on whether the DRB review process is arbitrary and subject to standardless and unilateral military discretion.**

Mr. Rahman has introduced evidence that the Commander at Bagram has unilateral, standardless, and unreviewable authority to reverse the recommendation of the DRB in nearly every case. Pet'rs' Opp'n 13-16 (citing a variety of primary evidence obtained through FOIA). Indeed, Mr. Rahman has alleged, based on an analysis of FOIA documents received in a separate proceeding, that in fifteen percent of cases, the Commander (or his designee) reverses some aspect of a DRB recommendation without explanation, and can prolong a detainee's detention. Am. Pet. ¶ 64.  Finally, Mr. Rahman has shown that the DRB process not only lacks any kind of judicial or other independent review whatsoever, but the review process that does exist—that of the Commander—is completely standardless. Pet'rs' Opp'n 14-16.

Respondents do not contest that the Commander can—and has—exercised his authority to overturn DRB recommendations, nor do they contest that the Commander's exercise of his authority is standardless. Instead, Respondents argue that "[t]here is no basis to suggest" military decision-makers "would simply ignore the record." Resp'ts' Opp'n 10.  But Mr. Rahman has alleged—and introduced evidence—that the Commander (or his designee) reverses DRB recommendations on the basis of "extraneous facts and considerations relayed to the Commander *ex parte* and kept secret from the detainee and his personal representative." Pet'rs'

Opp'n 16; *see also id.* at 15-16 (alleging that the Commander may overrule a recommendation to transfer a detainee "because the United States refuses to provide classified intelligence to Afghan authorities in support of prosecution.").  Respondents also argue that domestic law contains no due process requirement "that the final decision-maker in an administrative review process personally participate in the proceedings in which factual presentations are made."  Resp'ts' Opp'n 9.  Respondents' argument is inapposite and irrelevant.  The issue before this Court is whether the DRB process is structured so that DRBs are neutral and independent of the military command, as required by the laws of war.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (detainees have the right to challenge their detention "before a neutral decisionmaker" as opposed to a merely advisory body); *cf. Hamdan v. Rumsfeld*, 548 U.S. 557, 647-651 (2006) (Kennedy, J., concurring) (assessing Guantanamo military commission rules' compliance with the laws of war and finding that "the concentration of functions, including legal decisionmaking," in an Appointing Authority, rather than the commission, "remove safeguards that are important to the fairness of the proceedings and the independence" of the commissions); *see also Boumediene*, 553 U.S. at 766-67 (instructing courts to examine the impartiality and independence of review procedures to determine habeas jurisdiction).  Mr. Rahman has shown they are not.

Mr. Rahman is entitled to discovery to show the extent to which the Commander exercises his discretion—or not—consistent with *Boumediene* and *Al Maqaleh*'s requirements of independence and impartiality.

11

**B.  Mr. Rahman is entitled to jurisdictional discovery on the nature of the United States' presence at Bagram, its plans to hold certain categories of prisoners indefinitely, and its determinations with respect to Mr. Rahman in particular.**

Mr. Rahman has alleged, based on evidence not available to the court in *Al Maqaleh*, that the government "inten[ds] to occupy the Bagram base with permanence," and that the United States intends to keep exclusive jurisdiction and control over a portion of the Bagram prison indefinitely.  Pet'rs' Opp'n 20-24 (quoting *Al Maqaleh*, 605 F.3d at 97).  He has also identified, based on the statements of U.S. government officials, specific categories of detainees that are likely to be held in U.S. custody indefinitely.  Pet'rs' Opp'n 23-24.  Respondents do not rebut Petitioners' allegations that portions of the Bagram facility—and certain categories of detainees—will remain within exclusive U.S. jurisdiction control "with permanence."[6]  Instead, Respondents argue that these disputed factual issues are irrelevant (and discovery into them unnecessary) to the constitutional question of whether the United States exercises "*de facto* sovereignty*" at Bagram.  Resp'ts' Opp'n 19.  Respondents are mistaken for three reasons.

First, Respondents misstate the law when they assert that the only relevant jurisdictional question for the Court on the second *Boumediene/Al Maqaleh* factor is whether the United States exercises "*de facto* sovereignty*" in a theatre of war.  Resp'ts' Opp'n 19.  The D.C. Circuit expressly rejected this bright-line test in *Al Maqaleh*.  605 F.3d at 95 ("We . . . reject the proposition that *Boumediene* adopted a bright-line test with the effect of substituting *de facto*

_____

[6] The government for the first time in its opposition brief states that it has begun transferring control of Bagram to Afghanistan, having already transferred one housing unit.  Resp'ts' Opp'n 14 n.9.  To Petitioners' knowledge, the proposition has not been reported before and is not supported by any evidence in the record.  Discovery is necessary to determine the nature of this handover and future planned handovers.  Specifically, it is necessary to determine what categories of prisoners are being transferred to Afghan-controlled housing units, and whether these transfers genuinely put prisoners outside the ultimate jurisdiction and control of the United States.

[sovereignty] for *de jure* [sovereignty].").  Under *Boumediene* and *Al Maqaleh*, this Court must

look to all of the facts in order to determine whether detainees—and the prison within which they

are held—are "under the complete and total control of our Government."  *Boumediene*, 553 U.S.

at 771; *Al Maqaleh*, 605 F.3d at 97 (same, quoting *Boumediene*).  The evidence introduced by

Mr. Rahman and described above speaks directly to these points and raises factual disputes the

resolution of which would be aided by limited discovery.

Second, and contrary to Respondents' assertions, Resp'ts' Opp'n 19, Mr. Rahman does

not seek discovery into the United States' "intent" with respect to Bagram, but on the objective

reality represented by U.S. officials own statements:  a portion of Bagram will remain

indefinitely under complete U.S. government control, to hold a category of prisoners into the

indefinite and unforeseeable future.[7]

Finally, Mr. Rahman is specifically entitled to discovery on the outcome of his own DRB

proceedings and, in particular, on whether he has been found to fall within the category of

"enduring security threat" detainees whom the United States may keep in its custody even after

other detainees are transferred to Afghan authorities.  Respondents cannot credibly maintain that

such discovery would be irrelevant.  The Court in *Boumediene* had the benefit of precisely this

kind of individualized information in its record.  *See Boumediene*, 553 U.S. at 734 (noting that

"[e]ach petitioner" in that case "was determined to be an enemy combatant.").  Moreover,

because the Department of Defense has released just this kind of information about hundreds of

---

[7] Respondents' emphasis on a joint statement by President Obama and President Karzai expressing the intent to transfer detention operations to Afghan authorities is similarly unpersuasive.  Resp'ts' Opp'n 13-14, 19.  The reality remains that the United States maintains complete control over the fate of any detainee in its custody.  While Afghan authorities conduct separate detention operations and prosecutions outside Bagram, they have no authority whatsoever over when and whether a Bagram detainee in U.S. custody is released or transferred. *See* Harward Decl., Ex. C ¶ 13.

other detainees in response to the ACLU's FOIA request, it cannot argue that such discovery

would be too burdensome.  *See* Shamsi Decl., Ex. P-T.[8]

      **C.**      **Mr. Rahman is entitled to jurisdictional discovery on the existence of "practical obstacles."**

     Mr. Rahman has alleged that practical obstacles do not stand in the way of his access to

the Writ, and offers specific evidence in support.  Mr. Rahman establishes that fifty-two Afghan

civilian criminal trials have taken place at Bagram since the Court of Appeals decided *Al*

*Maqaleh*.  *See* Pet'rs' Opp'n 24-26; Shamsi Decl., Ex. L, N; Decl. of Daphne Eviatar ¶ 6, ECF

No. 19-2 ("Eviatar Decl.").[9]  He shows that habeas proceedings would be less onerous than the

full-blown Afghan civilian trials that are currently taking place, Pet'rs' Opp'n 25-26.  Finally, he

explains that a fair and transparent review process for Bagram detainees would enhance the

legitimacy that U.S. military commanders themselves have said would promote the war effort in

Afghanistan.  *Id.* at 26; *see also* Br. of Amicus Curiae in Supp. of Pet'rs ("Isr. Mil. Law Amicus

Br."), ECF No. 22 (judicial review is entirely practicable, including in the context of an armed

conflict).

---

    [8] In response to its FOIA request, the ACLU has received records relating to hundreds of detainees, but is still awaiting records relating to some DRB proceedings that occurred at Bagram between September 2009 and March 2010, a period during which Mr. Rahman would have had at least one DRB hearing.  No records relating to Mr. Rahman have yet been disclosed.

    [9] Respondents fail to mention the role of the U.S. government in assisting and hosting these trials and refer only to the Afghan government's role in them.  Resp'ts' Opp'n 16.  The reality is that both the U.S. military and U.S. government civilian employees are "mentoring" and assisting Afghan officials in conducting these trials.  *See* Farah Stockman, *Kinder Prison, Swifter Justice for U.S. Detainees in Afghanistan*, Boston Globe, Jan. 18, 2011, *available at* http://www.boston.com/news/nation/washington/articles/2011/01/18/kinder_prison_swifter_justi ce_for_us_detainees_in_afghanistan/; U.S. Dep't of Defense, News Briefing with Army Brig. Gen. Mark Martins via Teleconference from Afghanistan (Feb. 10, 2011), *available at* http://www.defense.gov/transcripts/transcript.aspx?transcriptid=4768%20.

Instead of disputing Mr. Rahman's specific factual assertions, Respondents contend, wrongly, that Bagram's location in Afghanistan, where an armed conflict continues, conclusively establishes insurmountable practical obstacles. Resp'ts' Opp'n 15-16, 19. Respondents also assert that discovery on the existence of practical obstacles is inappropriate because it would "intrude upon military operations" and "matters of foreign relations." Resp'ts' Opp'n 19-21. These contentions do not undermine Mr. Rahman's request for jurisdictional discovery; they support it.

First, the very fact that civilian trials are taking place at Bagram shows that the prison's location does not foreclose civil legal proceedings. Habeas proceedings—carefully monitored by this Court—will not be more onerous than Afghan criminal trials that Respondents are hosting and supporting. *See generally* Isr. Mil. Law Amicus Br. To the extent that Respondents assert that habeas proceedings are more burdensome, Mr. Rahman is entitled to limited discovery on how those burdens compare to U.S. efforts to host and assist in Afghan civilian trials. Discovery itself could be carefully cabined, and need not interfere with military operations or foreign affairs. Indeed, given that Respondents have voluntarily submitted two sworn declarations in this litigation on related matters, *see* Harward Decl. and Decl. of William K. Lietzau, ECF No. 15-2, their response to limited discovery would not unduly interfere with the military mission at Bagram.

Second, discovery would not intrude upon "matters of foreign relations," nor would it "compromise the Executive Branch's ability to interact effectively with Afghanistan." Resp'ts' Opp'n 20. As an initial matter, Mr. Rahman does not seek discovery on what the government of Afghanistan is doing with respect to civilian Afghan trials at Bagram, but on Respondents' alleged difficulties in conducting habeas proceedings at Bagram given that those civilian trials

15

are proceeding.  In addition, no Afghan court has jurisdiction over U.S. military personnel at

Bagram; the U.S. military retains sovereignty over Bagram; and the Afghan government may

only try Bagram detainees in Afghan civilian trials if the U.S. government first makes the

decision to transfer detainees in its custody to such trials.  *See* Harward Decl., Ex. A (lease

agreement between Afghanistan and the United States); *id.* at Ex. C. ¶ 13 (DRB rules vesting

release or transfer authority exclusively in U.S. officials).  *Cf. Boumediene*, 553 U.S. at 770

(finding that adjudicating habeas cases at Guantanamo would not "cause friction with the host

government.  No Cuban court has jurisdiction over American military personnel at Guantanamo

or the enemy combatants detained there . . . [t]he United States is, for all practical purposes,

answerable to no other sovereign for its acts on the base.").  Petitioners seek limited discovery

only from U.S. officials, not from Afghan authorities, and such discovery would not intrude at all

on the U.S. military's relations with the government of Afghanistan.

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Rahman's motion for leave to take

limited jurisdictional discovery.

Respectfully submitted,


   /s/ *Arthur B. Spitzer*             
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel: 202-457-0800
Fax: 202-452.1868
art@aclu-nca.org

Hina Shamsi
Jonathan Manes
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
Te: (212) 284-7321
Fax: (212) 549-2654
hshamsi@aclu.org

Jonathan Hafetz
169 Hicks Street
Brooklyn, NY 11201
Tel: (917) 355-6996
hafetzj@yahoo.com

Tina M. Foster
International Justice Network
PO Box 610119
New York, NY 11361-0119
Tel: (917) 442-9580
tina.foster@ijnetwork.org

Dated: April 13, 2011